UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br><br>584,741 USDT associated with the cryptocurrency wallet with address TTyRaPB6TQT9MEpwwRux4naX31Rov8e648,<br><br>Defendant *in Rem*. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No.: 25-cv-12539<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America, by its attorney, Leah B. Foley, United States Attorney for the District of Massachusetts, in a civil action of forfeiture *in rem* pursuant to 18 U.S.C. § 981(a)(1)(G) and Supplemental Rule G of the Federal Rules of Civil Procedure for Admiralty or Maritime Claims and Asset Forfeiture Actions, alleges that:

## NATURE OF ACTION

1. This action is brought by the United States of America pursuant to 18 U.S.C. § 981(a)(1)(G), seeking civil forfeiture of the following cryptocurrency:

   a. 584,741 USDT associated with the cryptocurrency wallet with address TTyRaPB6TQT9MEpwwRux4naX31Rov8e648

(the "Defendant Property").

## BACKGROUND ON THE INVESTIGATION

2. On December 13, 2024, a Criminal Complaint was filed in the District of Massachusetts charging MAHDI MOHAMMAD SADEGHI, a/k/a MOHAMMAD MAHDI SADEGHI ("SADEGHI") and MOHAMMAD ABEDININAJAFABADI, a/k/a MOHAMMAD ABEDINI ("ABEDINI") with Conspiracy to Violate the International Emergency Economic Powers Act ("IEEPA"), in violation of Title 50, United States Code, Section 1705, and ABEDINI with

Conspiracy to Provide Material Support to a Foreign Terrorist Organization, resulting in death, and Provision and Attempted Provision of Material Support to a Foreign Terrorist Organization, resulting in death, in violation of Title 18, United States Code, Section 2339B(a)(1). *See United States v. Sadeghi, et al*, No. 24-mj-01737-DLC. A copy of the Criminal Complaint Affidavit ("Complaint Aff.") is attached hereto at Exhibit A and incorporated herein by reference.

3. On December 19, 2024, a federal grand jury sitting in Boston returned a ten-count indictment charging SADEGHI and ABEDINI with Conspiracy to Violate IEEPA, in violation of Title 50, United States Code, Section 1705 (Count One), violations of IEEPA, in violation of Title 50, United States Code, Section 1705 (Counts Two through Eight), and charging ABEDINI with Conspiracy to Provide Material Support to a Foreign Terrorist Organization, resulting in death, and Provision and Attempted Provision of Material Support to a Foreign Terrorist Organization, resulting in death, in violation of Title 18, United States Code, Section 2339B(a)(1) (Counts Nine and Ten). *See United States v. Sadeghi, et al*, Crim. No. 24-cr-10391-IT. The Indictment also contained a forfeiture allegation pursuant to pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and (G) and Title 28, United States Code, Section 2461(c), and Title 19, United States Code, Section 1595a(d). A copy of the Indictment is attached hereto at Exhibit B and incorporated herein by reference.

4. ABEDINI was an Iranian citizen and resident of Iran and Switzerland.

5. SADEGHI was a naturalized U.S. citizen originally from Iran and a resident of Natick, Massachusetts.

6. On December 16, 2024, ABEDINI was arrested in Italy pursuant to a United States arrest warrant, and the United States submitted an extradition request to the government of Italy.

7. On December 27, 2024, the United States obtained a seizure warrant for all USDT stored in or accessible in the cryptocurrency wallet with address

TTyRaPB6TQT9MEpwwRux4naX31Rov8e648, and on or about April 16, 2025, the Defendant Property was transferred to a U.S. government-controlled wallet.

8. On or about January 12, 2025, ABEDINI was released from Italian custody and is believed to have traveled to Iran.

## JURISDICTION AND VENUE

9. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345 and 1355. Venue is proper pursuant to 28 U.S.C. §§ 1355(b)(1) and 1395 because acts and omissions giving rise to the forfeiture occurred in the District of Massachusetts and pursuant to 18 U.S.C. § 981(h) because ABEDINI is subject to criminal prosecution that is the basis for forfeiture of the Defendant Property in the District of Massachusetts.

## STATUTORY AUTHORITY

10. Pursuant to 18 U.S.C. § 981(a)(1)(G)(i) and (ii), the following property is subject to civil forfeiture to the United States:

> All assets, foreign or domestic--
>
> (i) of any individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization; [and]
>
> (ii) acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing any Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property[.]

11. Pursuant to 18 U.S.C. § 2332b(g)(5), the term "Federal crime of terrorism" means an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of one of the statutes enumerated in 18 U.S.C. § 2332b(g)(5)(B), including a violation of 18 U.S.C. § 2339B.

3

12. In interpreting the language in 18 U.S.C. § 981(a)(1)(G)(i) regarding "source of influence over," courts have looked to Racketeer Influenced and Corrupt Organizations Act ("RICO") forfeiture law, which also uses the phrase "source of influence over." Those courts concluded that the language in § 981(a)(1)(G)(i) should be interpreted in the same manner as it is under the RICO statute, where "courts consider whether property was 'used to further the affairs of the enterprise' or 'made the prohibited conduct less difficult.'" *United States v. $601,426.19 of Funds Associated With Dynapex Energy Ltd.*, No. 24-CV-542 (JMC), 2024 WL 4854310, at *6 (D.D.C. Nov. 21, 2024) (citing *United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, No. 20-CV-1791, 2021 WL 4502056, at *4 (D.D.C. Oct. 1, 2021) and other cases).

## CRYPTOCURRENCY BACKGROUND

13. Virtual currency is a digital asset or digital representation of value that can be electronically traded and exchanged online. Virtual currency is not backed or insured by a central bank and its value may or may not be tied to or secured by a fixed asset. Like many fiat currencies, many virtual currencies have a market-based value that goes up or down based on various factors.

14. Cryptocurrency is a subset of virtual currency that utilizes blockchain technology. A blockchain is a distributed ledger, recorded on a decentralized network, containing an immutable and historical record of every transaction made with the cryptocurrency.

15. Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

16. Tether ("USDT") is a stablecoin. Each USDT token is worth $1.00 USD and claimed to be backed by $1.00 USD in physical reserves. Payments or transfers of value made with

USDT are recorded in the blockchain network. Tether Limited is the company that manages the smart contracts and the treasury (*i.e.*, the funds held in reserve) for USDT Tokens.

17. To seize the applicable USDT, Tether Limited will "burn" (*i.e.*, destroy) the USDT tokens currency associated with the cryptocurrency wallet and reissue the equivalent amount of USDT tokens and transfer that equivalent amount to a government-controlled cryptocurrency wallet. In accordance with this process, Tether transferred the Defendant Property to a U.S. government-controlled wallet on April 16, 2025.

18. Virtual currency addresses are the specific virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of alphanumeric characters. A user of virtual currency can utilize multiple addresses at any given time and there is no limit to the number of addresses any one user can utilize, similar to bank accounts.

19. Each virtual currency address is controlled through a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

20. There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. The virtual currency wallets at issue for the purposes of this affidavit are software wallets (*i.e.*, a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys). A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

21. Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds.

Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

22.     Many virtual currencies publicly record all their transactions on what is referred to as the "blockchain." The blockchain is essentially a distributed public ledger, run by a decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies. Ethereum and TRON are examples of blockchain networks.

23.     Blockchain explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses application programming interface (API) and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format. An API is a set of definitions and protocols for building and integrating application software.

24.     Virtual Currency Exchanges (VCEs), such as Binance and Kraken, are trading and/or storage platforms for virtual currencies (*e.g.*, BTC and ETH). There are generally two types of VCEs: centralized exchanges and decentralized exchanges, which are also known as "DEXs." Binance and Kraken are centralized exchanges. Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (*i.e.*, know

your customer or KYC checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

25. As previously stated, while the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (e.g., the Bitcoin blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity.

## FACTUAL ALLEGATIONS

26. As set forth in the affidavit in support of the Criminal Complaint, and as a federal Grand Jury found in issuing the Indictment, probable cause exists that from at least on or about April 15, 2019, through on or about December 16, 2024, ABEDINI conspired to provide material support to a foreign terrorist organization resulting in death, in violation of 18 U.S.C. § 2339B(a)(1), and provided and attempted to provide, and aided and abetted others providing, material support to a foreign terrorist organization resulting in death in violation of 18 U.S.C. §§ 2339B(a)(1) and 2.

27. ABEDINI was a co-founder of San'at Danesh Rahpooyan Aflak Co. ("SDRA" or "SADRA") in Iran, and from in or around 2011 to the present, he served as the CEO and/or the Managing Director of SDRA. *See* Indictment ¶ 5; *see also* Complaint Aff. ¶ 6, 27-28.

28. SDRA is a company based in Tehran, Iran that specializes in the sale of navigation systems and supporting software that have significant military applications. SDRA's primary business was the design and manufacture of its proprietary Sepehr Navigation System ("Sepehr"), which had applications in Unmanned Aerial Vehicles ("UAVs"), also known as drones, as well as cruise and ballistic missiles. *See* Indictment ¶ 6; *see also* Complaint Aff. ¶ 6.

29. Since at least in or about 2014, SDRA has sold products, including the Sepehr Navigation System, to the Islamic Revolutionary Guard Corps ("IRGC") Aerospace Force,

which was the strategic missile, air, and space force within the IRGC and served as the primary operator of Iran's fleet of UAVs. The IRGC was an Iranian military and counterintelligence organization under the authority of the Supreme Leader of Iran. Among other things, the IRGC played a key role in Iran's development of ballistic missiles, UAVs, and in Iran's support for international terrorism and foreign terrorist organizations. *See* Indictment ¶ 8; *see also* Complaint Aff. ¶¶ 6, 29.

30. In 2019, ABEDINI co-founded a company in Switzerland called ILLUMOVE, which serves as a front for SDRA to conceal SDRA's involvement in certain exports of goods and technology from the United States and business transactions with U.S. companies. Specifically, ABEDINI and SADEGHI used ILLUMOVE to procure U.S.-origin goods, services, and technology for export to Iran, in violation of U.S. export controls and sanctions laws. *See* Complaint Aff. ¶¶ 8, 51-56. One of the objectives of ILLUMOVE was to evade U.S. sanctions and export restrictions imposed on Iran, and funds from ILLUMOVE were to be transferred through ABEDINI to SDRA in Iran. *See* Indictment ¶¶ 23.d-f.

31. As set forth in the Indictment, the object of the material support conspiracy was to provide the IRGC with material support and resources, to wit, services, property, and personnel, knowing that the IRGC was a designated terrorist organization (as defined in 18 U.S.C. § 2339B(g)(6)), that the IRGC engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that the IRGC engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of 18 U.S.C. § 2339B. *See* Indictment ¶ 24; *see also* Complaint Aff. ¶¶ 10, 22-25.

32. On April 15, 2019, the United States Secretary of State designated the IRGC as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality

Act. To date, the IRGC[1] remains a designated FTO. As set forth in the Indictment, among the manner and means by which ABEDINI and coconspirators known and unknown to the Grand Jury carried out the material support conspiracy were the following:

    a.    In or around 2011, ABEDINI founded SDRA in Iran to manufacture advanced products in guidance and control systems, *i.e.*, navigation systems, which SDRA intended to sell to the military and missile industries in Iran. Thereafter, ABEDINI served as the CEO and/or the Managing Director of SDRA.

    b.    ABEDINI procured U.S. goods, services, and technology used in the manufacturing of SDRA's Sepehr Navigation System in violation of U.S. sanctions and export controls. At times, ABEDINI obtained parts that are known to be used in the Sepehr Navigation System from a global

---

[1] The IRGC is also known as the Islamic Revolutionary Guards Corps; Islamic Revolution Guards Corps; Iran's Revolutionary Guard Corps; Islamic Revolutionary Corps; IRG; The Iranian Revolutionary Guards; Islamic Revolutionary Guards; Iran's Revolutionary Guards; Revolutionary Guards; Revolutionary Guard; Army of the Guardians of the Islamic Revolution; The Army of the Guardians of the Islamic Revolution; AGIR; Pasdaran; Pasdaran-e Inqilab; Pasdarn-e Enghelab-e Islami; Sepah; Sepah Pasdaran; Sepah-e Pasdaran-e Enghelab-e Eslami; Sepah-e Pasdaran Enghelab Islami; Islamic Revolutionary Guard Corps-Qods Force; IRGC-Quds Force; IRGC-QF; Qods Force; Sepah-e Qods; Jerusalem Force; Al Qods; Islamic Revolutionary Guard Corps (IRGC)-Qods Force; Pasdaran-e Enghelab-e Islami (Pasdaran); Sepah-e Qods (Jerusalem Force); Qods (Jerusalem) Force of the IRGC; Quds Force; IRGC Ground Forces; Islamic Revolution Guards Corps Ground Force; Basij; Baseej; Basij-e Melli; Islamic Revolution Guards Corps Resistance Force; Basij Resistance Forces; Mobilization of the Oppressed; Mobilization of the Oppressed Unit; Mobilization of the Oppressed Organization; Organization of the Mobilisation of the Oppressed; Sazman Basij Melli; Sazman-e Moghavemat-e Basij; Sazeman-e Basij-e Mostazafan; Vahed-e Basij-e Mostazafeen; Vahed-e Basij Mostaza'feen; National Mobilization Organization; National Resistance Mobilization; Resistance Mobilization Force; Nirooye Moghavemate Basij; Niruyeh Moghavemat Basij; IRGC Air Force; Islamic Revolution Guards Corps Air Force; Islamic Revolutionary Guards Corps Air Force; Islamic Revolutionary Guard Corps Air Force; IRGCAF; Sepah Pasdaran Air Force; Air Force, IRGC (Pasdaran); Islamic Revolutionary Guards Corps Aerospace Force; Aerospace Force of the Army of the Guardians of the Islamic Revolution; AFAGIR; Aerospace Division of IRGC; IRGC Aerospace Force; IRGCASF; IRGC Navy; Islamic Revolution Guards Corps Naval Force.

9

        semiconductor business headquartered in Massachusetts ("U.S. Company 1") and other U.S. companies using his ILLUMOVE address in Switzerland.

    c.    From at least in or around 2014 through the present, SDRA supplied the IRGC Aerospace Force with the Sepehr Navigation System, including over 1,800 units of the Sepehr during the 2022-2023 fiscal year. During that same fiscal year, the IRGC Aerospace Force paid SDRA over 290,492,106,100 Rials (approximately $6,875,541 USD).

    d.    Since at least 2019 to the present, SDRA has publicly obfuscated its Iranian military ties. As compared to its website from in or around 2016 to 2018, which indicated that SDRA designed and manufactured navigation modules for cruise and ballistic missiles, SDRA's current website provides a general overview of SDRA products and services but does not reference its military ties. However, SDRA's target market for its navigation products was and continues to be the IRGC.

*See* Indictment ¶ 25; *see also* Complaint Aff. ¶ 9 ("ABEDINI conspired with others known and unknown to provide material support to the IRGC by selling its Sepehr Navigation System to the IRGC, including the IRGC Aerospace Force, and by procuring goods and technology from U.S. Company 1,[2] including technology that had not yet been publicly released, to aid SDRA's business objectives in support of the IRGC"); *see also* Complaint Aff. ¶¶ 29-32, 41-42, 51, 53, 69.

---

[2] As described in the Indictment, ABEDINI caused U.S. Company 1 to export goods and technology to Switzerland, which ABEDINI subsequently transported to Iran. *See* Indictment ¶ 24.

33. As further set forth in the Indictment, the IRGC, including the IRGC Aerospace Force, has played a key role in the development and manufacture of lethal one-way attack UAVs, including the Shahed-101, which have been utilized by Iran and other actors, including Iran-backed militias. Unmanned combat UAVs, including the Shahed-101, are designed to kill, and they have resulted in deaths, including the deaths of civilians and U.S. service members. *See* Indictment ¶ 12; *see also, e.g.,* Complaint Aff. ¶¶ 11–13.

34. For example, on or about January 28, 2024, three U.S. service members were killed, and more than forty others were injured, by an Iranian-made Shahed-101 in a drone attack by Iran-backed militants on a military base (known as "Tower 22") located in northern Jordan, near the Syrian border. The Shahed-101 that caused the death of the U.S. service members contained a Sepher Navigation System manufactured by ABEDINI's company, SDRA. *See* Indictment ¶ 13; *see also* Complaint Aff. ¶¶ 12–13.

35. As set forth below, the Defendant Property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) and (ii).

36. The Defendant Property is USDT associated with an unhosted cryptocurrency wallet with address TTyRaPB6TQT9MEpwwRux4naX31Rov8e648 (the "Cryptocurrency Wallet"), on the TRON blockchain network.

37. On or about November 29, 2023, ABEDINI sent an image via WhatsApp of information from TronLink, a company that allows the creation of decentralized self-custody cryptocurrency wallets, that contained (1) a scannable QR code, which is a machine-readable code consisting of an array of black and white squares typically used for storing URLs or other information for reading by the camera on a smartphone, (2) the address of the Cryptocurrency Wallet, and (3) the name "Aflak" above the Cryptocurrency Wallet address.

38.     As noted above, "Aflak" is part of the name of ABEDINI's Iranian company, San'at Danesh Rahpooyan Aflak Co. or SDRA—which, as discussed above, provides the navigation system for the IRGC's lethal one-way attack drones—and, based on the review of records obtained in this investigation, ABEDINI was referring to SDRA when he used the term "Aflak" in connection with the Cryptocurrency Wallet.

39.     Sending a QR code for access to a cryptocurrency address or sending a cryptocurrency address is indicative of a person owning the cryptocurrency address and requesting to receive funds sent to that address for their benefit. Here, on the same day ABEDINI sent the WhatsApp message with the cryptocurrency address, the Cryptocurrency Wallet received two transfers of funds totaling 148,670 USDT.

40.     In addition, as part of the investigation, law enforcement reviewed the transaction history related to the Cryptocurrency Wallet, and traced funds sent from the Cryptocurrency Wallet, which further demonstrated a connection between the USDT in the Cryptocurrency Wallet and ABEDINI.

41.     ABEDINI is the owner of a cryptocurrency account at Payward Ventures, Inc. d/b/a/ Kraken (the "Kraken account"), a U.S.-based cryptocurrency exchange. ABEDINI's Kraken account and the Cryptocurrency Wallet both sent funds to the same cryptocurrency address TRdSwBbnCKyrkmh8EjUd6L7BUWUpzYAYg7 ("TRdSwBbn"). Specifically, the Cryptocurrency Wallet transferred 20,000 USDT to TRdSwBbn on August 5, 2024, and ABEDINI's Kraken account sent approximately 36,083 USDT to TRdSwBbn over 11 transactions from September 4, 2023, through January 25, 2024.

42.     According to clustering by blockchain analytics software, all funds received by TRdSwBbn were then sent to Nobitex[.]ir, which is an Iranian-based exchange. A majority of the funds sent to TRdSwBbn (48,468.7207 USDT or 86.41%) were sent to the same hosted

12

address at Nobitex[.]ir, TVLRqrwnGLkc9dvvfR1hQhVxBg1U3rvUtn ("TVLRqrwn").

43. In summary, funds from the Cryptocurrency Wallet and ABEDINI's Kraken account were sent to TRdSwBbn and shortly thereafter to the same hosted address at Nobitex[.]ir, TVLRqrwn. See summary image below:



Note: TRdSwBbn received and sent 56,093.7207 USDT in total. An additional 10.0288 USDT received is not included in this graph.

44. Based on ABEDINI referring to the Cryptocurrency Wallet by "Aflak," a shortened version of SDRA; ABEDINI sending the address to an unknown person and then, on the same day, receiving funds; and the transaction history demonstrating that funds from ABEDINI's known Kraken account and the Cryptocurrency Wallet were transferred to the same cryptocurrency address hosted on an Iranian cryptocurrency exchange, the Cryptocurrency Wallet is a cryptocurrency wallet controlled by ABEDINI and associated with his company

13

SDRA, and the Defendant Property is controlled by ABEDINI and associated with his company SDRA.

45. Accordingly, the Defendant Property is an asset of ABEDINI and/or his company SDRA and thus subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(G)(i) and (ii), as (1) assets, foreign or domestic, of an individual, entity, or organization engaged in planning or perpetrating a Federal crime of terrorism against the United States, citizens or residents of the United States, or their property; (2) assets, foreign or domestic, affording any person, here, ABEDINI, a source of influence over any such entity or organization, here, the IRGC; and (3) assets, foreign or domestic, acquired or maintained by any person, here, ABEDINI, with the intent and for the purpose of supporting, planning, conducting, or concealing any Federal crime of terrorism against the United States, citizens or residents of the United States, or their property.

## FIRST CLAIM FOR FORFEITURE
(18 U.S.C. § 981(a)(1)(G)(i))

46. The allegations contained in paragraphs 1 to 45 are incorporated herein.

47. As set forth above, the Defendant Property is an asset, foreign or domestic of an individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, or an asset, foreign or domestic, affording any person a source of influence over any such entity or organization.

48. Accordingly, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(G)(i).

## SECOND CLAIM FOR FORFEITURE
(18 U.S.C. § 981(a)(1)(G)(ii))

49. The allegations contained in paragraphs 1 to 45 are incorporated herein.

50. As set forth above, the Defendant Property is an asset, foreign or domestic

acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing any Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property.

51. Accordingly, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(G)(ii).

WHEREFORE, the United States of America requests:

a. That a Warrant and Monition, in the form submitted herewith, be issued to the United States Marshals for the District of Massachusetts or its designee, commanding seizure of the Defendant *in rem*, and to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

b. That judgment of forfeiture be decreed against the Defendant *in rem*;

c. That thereafter, the Defendant *in rem* be disposed of according to law; and

d. For costs and all other relief to which the United States may be entitled.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:  /s/ *Carol E. Head*
CAROL E. HEAD
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
Dated: September 11, 2025           carol.head@usdoj.gov

## Verification

I, Ronald Paul Neal, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation and, pursuant to 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, information, and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, and my investigation of this case together with other law enforcement officers.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct. Executed this 11 day of September 2025.

Ronald Paul Neal
Special Agent
Federal Bureau of Investigation